## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ADAM PRESS, on behalf of himself and all
others similarly situated,

        Plaintiffs,

v.

PUTNAM INVESTMENT FUNDS, et al.,

        Defendants.

Civil Action No. 05-CV-10923 (NG)

## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

All Defendants respectfully submit this Memorandum of Law in opposition to Plaintiff's Motion to Remand this action to the Suffolk County Superior Court of the Commonwealth of Massachusetts. As discussed below, Plaintiff's claim is completely preempted by the Securities Litigation Uniform Standards Act 1998 ("SLUSA"), 15 U.S.C. §§ 77p(b), 78bb(f)(1). The Complaint also presents substantial federal questions, over which this Court has jurisdiction. Accordingly, Plaintiff's Motion to Remand should be denied.

### Introduction

This case is one of more than 60 cases filed against Putnam management investment companies, their investment advisers, and other service providers since the fall of 2003 alleging misconduct relating to the "market timing" of Putnam mutual funds. As with the others, the case is a direct result of investigations by the U.S. Securities and Exchange Commission and state regulators relating to market timing in the mutual fund industry, which culminated in consent orders relating to Putnam funds and numerous other mutual fund "complexes." *See* Compl. ¶¶ 3, 22-26 (citing orders).

Beginning in February 2004, the Judicial Panel on Multidistrict Litigation ("JPML" or "Panel") has transferred the vast majority of these cases – including a number that were removed from state court – to the United States District Court for the District of Maryland ("MDL Court") for coordinated pretrial case management, as part of a comprehensive multidistrict litigation involving not only the cases concerning Putnam mutual funds, but more than 300 other cases asserting similar claims with respect to other mutual fund "complexes" ("Mutual Fund MDL").

In this Court, Plaintiff asks that his case be remanded to state court, so that he may litigate separate from the Mutual Fund MDL. While the crux of his claim is the same alleged market timing of mutual funds that is at the core of all the cases pending before the MDL Court, Plaintiff says that since his claim is made on behalf of certain *holders* of mutual fund shares, he can avoid preemption under SLUSA and proceed in state court instead. Plaintiff further argues that his claim involves no federal question sufficient to confer jurisdiction on this Court, and that the outcome in this case is controlled by Judge Young's ruling in a prior case, *Meyer v. Putnam International Voyager Fund,* 220 F.R.D. 127 (D. Mass. 2004).

Plaintiff is wrong. As recent decisions by the Second, Third and Seventh circuit courts of appeals make clear, a plaintiff cannot avoid SLUSA preemption simply by claiming to be a "holder." SLUSA preempts claims alleging misconduct "in connection with" the purchase or sale of securities, and if the facts pleaded show that this condition is met, the case is preempted. *See Kircher v. Putnam Funds Trust,* 403 F.3d 478, 482-84 (7th Cir. 2005); *Rowinski v. Salomon Smith Barney Inc.,* 398 F.3d 294, 300-05 (3d Cir. 2005); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 44-51 (2d Cir. 2005). Plaintiff's claim also necessarily raises substantial federal questions, and Judge Young's opinion in *Meyer* is not controlling. Accordingly, Plaintiff's Motion to Remand should be denied.

**Motion To Stay**

On May 6, 2005 Defendants filed a Notice of Tag-Along Action with the JPML, seeking transfer of this case to the MDL Court (dkt. 2). On May 26, the JPML issued a Conditional Transfer Order ("CTO"), finding that the case "appears . . . [to] involve[ ] questions of fact which are common to the actions previously transferred to the District of Maryland." *See* CTO-18, Ex. 1 to Memorandum in Support of Defendants' Motion to Stay (dkt. 9).

On June 7, before the JPML, Plaintiff filed a Motion to Vacate the CTO, arguing that the case should not be transferred to the MDL Court. On June 10, in this Court, Defendants filed a Motion to Stay further proceedings until the JPML decided whether to transfer the case (dkt. 8). On June 14, the JPML scheduled Plaintiff's motion for hearing on July 28, 2005. *See* First Amendment to the Hearing Session Order and Attached Schedule (June 14, 2005) (Ex. 1 hereto).

Defendants respectfully suggest that, for the reasons set forth in their Motion to Stay, this Court should defer consideration of Plaintiff's Motion to Remand until the JPML has determined whether the case should be transferred to the MDL Court. If transfer is ordered, the motion may be considered with other cases identical to this one that have been removed to federal court and tagged for transfer to the MDL Court, and with other cases previously transferred to the MDL Court presenting similar legal issues. Indeed, in a preliminary ruling on the issue of SLUSA preemption, the MDL Court expressly noted that:

> The alleged wrongdoing giving rise to plaintiffs' claims occurred in the national securities market – a market extensively regulated by federal authorities. . . . The need for a single rule of decision in a complex financial environment in which innumerable institutions and firms participate . . . appears self-evident.

*In re Alger, Columbia, Janus, MFS, One Group and Putnam Mutual Fund Litig.,* 320 F. Supp. 2d 352, 355-56 (D. Md. 2004). These considerations urge deferral of Plaintiff's Motion to Remand at this time.

## The Complaint

In his Complaint, Plaintiff Adam Press claims that he owns "Class B" shares of a mutual fund, the Putnam International New Opportunity Fund, that require him to pay a contingent deferred sales charge ("CDSC") in the event he redeems the shares prior to the expiration of six years from the date he purchased them. Compl. ¶¶ 1, 7.[1] Plaintiff admits he agreed to pay these charges when he purchased his shares, but says he now desires to avoid this obligation because "Putnam through certain of its employees (and agents) engaged in misconduct . . . including market timing . . . [and] unfair business practices" regarding Putnam mutual funds. *Id.* ¶¶ 2, 20. Purportedly on behalf of a class of mutual fund investors, Plaintiff sues more than 50 different Putnam management investment companies, in addition to the one that issued his shares.

## ARGUMENT

Plaintiff's Motion to Remand should be denied because his claim is completely preempted by SLUSA. In addition, the Complaint presents substantial questions of federal law over which this Court has jurisdiction.

## I.    Plaintiff's Claim Is Preempted by SLUSA.

SLUSA was adopted to "make[ ] Federal Court the exclusive venue for most securities class action lawsuits . . . [and to] prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal, court." H.R. Conf. Rep. No. 105-803 (1998), at 13. *See Behlen v. Merrill Lynch,* 311 F.3d 1087, 1091-92 (11th Cir. 2002). To achieve this goal, SLUSA expressly preempts any "covered class action based upon the statutory or common law of any State," which alleges either an "untrue

---

[1]      Mutual funds distributed through brokers, life insurance companies, and other intermediaries typically carry fees, called "sales loads," which are charged to shareholders either at the time of purchase, upon redemption, or both. Where shares of the same fund are offered with different load options, the shares are typically divided into different classes, with Class B shares usually involving no front-end load, but a CDSC that declines over time. *See generally ING Principal Protection Funds Deriv. Litig.,* 2005 WL 1107072, at *1 (D. Mass. May 9, 2005).

statement or omission of a material fact" or the use of "any manipulative or deceptive device," "in connection with the purchase or sale of a covered security." 15 U.S.C. §§ 77p(b), 78bb(f)(1).

As set forth in Defendants' Notice of Removal, the Complaint in this case meets all of these requirements. Indeed, in his Motion to Remand, Plaintiff challenges only one of these requirements – that the misconduct he alleges is "in connection with" the purchase or sale of securities. (Pl. Mem. at 5-7). Plaintiff's argument is incorrect, and his claim is preempted.[2]

## A.  Because SLUSA Is a Remedial Statute, Its "In Connection With" Requirement Must Be Construed Broadly.

SLUSA is a remedial statute designed to prevent securities class action plaintiffs from circumventing the procedural protections Congress adopted in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737 (1995). The PSLRA, codified in relevant part at 15 U.S.C. § 78u-4, prescribes heightened pleading standards for private securities fraud suits, 15 U.S.C. § 78u-4(b)(1) & (2), and requires the dismissal of any complaint that fails to meet these heightened pleading requirements. 15 U.S.C. § 78u-4(b)(3)(A). The PSLRA also provides for a mandatory stay of discovery during the pendency of a motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B). Shortly after it was adopted, "Congress realized that many of the goals of [the] PSLRA were being frustrated because plaintiffs were simply shifting their securities class actions from federal to state court, where the PSLRA did not restrict their claims." *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1341 (11th Cir.) (citing Pub. L. No

---

[2]      In the "Facts" section of Plaintiff's Motion to Remand, Plaintiff asserts that "there is no allegation that defendants made any misrepresentations about their funds" and that the "Complaint does not allege fraud in connection with the purchase or sale of securities." Pl. Mem., at 3. To the extent this constitutes an argument that the Complaint does not allege any material misstatement or omission, or any manipulative or deceptive device, *see* 15 U.S.C. § 77p(b)(1), (2), it ignores the plain language of the Complaint. *See, e.g.*, Compl., ¶¶ 18, 19 ("Putnam . . . represented and warranted that it would continue to conduct its business at the same level of integrity"), ¶ 20 (Defendants engaged in "misconduct," including "unfair business practices," and their integrity was "seriously compromised"); ¶ 26 (Defendants allegedly "unethical or dishonest"), ¶ 30(c) (defendants allegedly "engag[ed] in unfair and deceptive trade practices"). *See also Rowinski*, 398 F.3d at 299-300 (claims alleging misrepresentations or omissions are preempted, regardless of whether they are legal elements of the claims).

105-353 § 2(2)), *cert. denied*, 537 U.S. 950 (2002).  SLUSA was adopted in 1998 to close this

loophole. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001).

The federal courts of appeals have instructed that "[i]n construing the meaning of

SLUSA's key terms, [a court] must view SLUSA in this larger statutory context." *Riley,* 292

F.3d at 1340.  Hence, when a court considers whether SLUSA's "in connection with

requirement" has been met, the statute should be "construed not technically and restrictively, but

flexibly to effectuate its remedial purposes." *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129

(9th Cir. 2002) (quoting *SEC v. Zandford*, 525 U.S. 813, 819 (2002)).[3]

Although SLUSA does not define the phrase "in connection with," the identical phrase is

found in Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b).  Courts construing

SLUSA's "in connection with" requirement, therefore, have looked to cases interpreting the

identical language in Section 10(b).  *See Falkowski*, 309 F.3d at 1129; *Riley*, 292 F.3d at 1342.

According to the Supreme Court, the "in connection with" requirement of Section 10(b)

should be construed broadly.  For example, in *SEC v. Capital Gains Research Bureau*, 375 U.S.

180, 186 (1963), the Supreme Court ruled that the "in connection with" requirement must be

construed "not technically and restrictively, but flexibly" in order to promote the remedial

purpose of Section 10(b). *Id.* at 195.  *See also Affiliated Ute Citizens v. United States*, 406 U.S.

128, 151 (1972) (same).  Applying this principle in *Superintendent of Ins. v. Bankers Life & Cas.

Co.*, 404 U.S. 6 (1971), the Supreme Court found that the "in connection with" requirement was

met when deceptive practices "touch" the purchase or sale of securities.  *Id.* at 12-13.

The Supreme Court reiterated this principle in *SEC v. Zandford*, 535 U.S. 813 (2002).  In

that case, a securities broker persuaded two clients to open a joint account, then liquidated their

---

[3]     Plaintiff argues that "removal statutes" should be strictly construed. Pl. Mem., at 3-4.  However, SLUSA
is not a "removal statute," it is a remedial statute, and therefore "should be construed broadly to effectuate its
purposes." *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (applying "familiar canon of statutory construction").

securities and misappropriated the funds for his own use.  *Id*. at 815-16.  The Supreme Court rejected the argument that the facts showed only common law fraud, conversion and breach of fiduciary duty, noting that the complaint described "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide."  *Id*. at 825.  *See also United States v. O'Hagan,* 521 U.S. 642, 656 (1997) (misconduct and securities transaction coincide where attorney used information about client's planned tender offer to trade stock of target company).

Accordingly, SLUSA's "in connection with" requirement should be considered satisfied if the alleged misconduct "coincides" with or "touches" a purchase or sale of securities. *Zandford*, 535 U.S. at 822; *Bankers Life*, 404 U.S. at 12-13.  This standard is established when misconduct has more than a "tangential" relation to a securities transaction, *Falkowski,* 309 F.3d at 1130-31, or "necessarily involve[s] allegations of a purchase or sale of securities," *Dabit*, 395 F.3d at 48, or if "the prayer for relief 'connects' the state law claims to the purchase or sale of securities." *Rowinski*, 398 F.3d at 302.

## B.    The "In Connection With" Requirement Is Met Here.

The allegations in the Complaint readily meet these standards.  The alleged misconduct coincides with the purchase and sale of Putnam fund shares because (1) the essence of the Complaint is that Defendants breached a term or condition of the agreement under which Plaintiff purchased his shares, which will damage Plaintiff once he redeems those shares, and (2) Plaintiff's class definition expressly includes other investors who already have redeemed their shares and suffered this alleged injury, and does not exclude claims by investors who purchased shares during the class period.  In addition, even if the Complaint had expressly excluded claims by purchasers and sellers of Putnam Funds, the case still would be preempted because SLUSA is not limited to claims brought by purchasers and sellers of securities.

**1.   Plaintiff Alleges That Defendants Breached A Condition Of Their Contract, And That He Is Injured When Shares Are Redeemed.**

As alleged in the Complaint, when Plaintiff purchased his shares, he did so pursuant to a contract that required him to pay a CDSC if he redeemed those shares before the expiration of six years from the date of purchase.  Compl. ¶ 1.  Plaintiff further alleges that "an implied term of the agreement pursuant to which the investments were made," *id.* ¶ 2, was that Defendants would make "the interests of fund shareholders their highest priority."  *Id.* ¶ 18.  Plaintiff claims Defendants breached the parties' agreement by "engaging in various forms of misconduct, including market timing, which indicated . . . that the interests of the fund shareholders was not the highest priority, that they did not act in good faith . . . and that their integrity was seriously compromised."  *Id.* ¶ 20.  Because of this alleged breach, Plaintiff argues, he and the members of the putative class should be allowed to redeem their shares without paying the CDSC.  *Id.*

First, these claims "necessarily involve allegations of a purchase or sale of securities." *Dabit*, 395 F.3d at 48.  According to the Complaint, the alleged misconduct violated a contract term "pursuant to which" Plaintiff *purchased* his shares.  Compl. ¶ 2.[4]  In addition, as alleged in the Complaint, the CDSC only takes effect upon a *redemption* of those shares within a six-year period following their purchase.  *Id.* ¶ 1.  In fact, some putative class members have *already redeemed* their shares, and "been . . . required to pay a significant [CDSC] charge," *id.* ¶ 25, which the Complaint seeks to recover.  *Id.* at 11.  Plaintiff's claim therefore touches, coincides with, and is directly connected to his purchase and redemption of shares in Putnam funds.  *See Rowinski,* 398 F.3d at 303 ("prayer for relief encompasses trading fees and commissions – charges incurred only in connection with the purchase and sale of securities"); *Behlen*, 311 F.3d

---

[4]        This alleged breach was allegedly "so material as to justify Plaintiff and all class members to terminate the contracts."  *Id.* ¶ 31.  By definition, a material breach occurs when "an essential and inducing feature of the contract" is violated.  *See, e.g., Lease-It, Inc. v. Mass. Port Auth.,* 33 Mass. App. Ct. 391, 396 (1992).

at 1094 (fees and commissions about which plaintiffs complain "were not incidental to the sale of securities, but were an integral part of the transactions"); *Falkowski,* 309 F.3d at 1130-31 (concealment of facts about company's operations "coincides" with plaintiffs' acquisition of stock options and therefore meets SLUSA's "in connection with" requirement).

Second, as the Complaint makes clear, Plaintiff bases his claim of breach on certain consent orders entered by the SEC and state regulators. Compl. ¶¶ 22-26. In particular, Plaintiff expressly relies on the "specificity of the wrongdoing alleged" by these government authorities, *id.* ¶ 3, including "a litany of findings constituting misconduct," and the assertion that "Putnam had . . . allow[ed] some managers and certain plan participants to market time its mutual funds." *Id.* ¶ 23. Notwithstanding this misconduct, claims Plaintiff, "Class Members that wish to sell their shares . . . have been and will be required to pay a significant charge." *Id.* ¶ 25.

The SEC Orders that Plaintiff references state, among other things, that "Putnam has known since at least 2000 that certain of its investment professionals were engaging in short-term trading of Putnam funds in their personal accounts," and that Putnam "failed to take adequate steps to detect and deter such trading activity." SEC Order Making Findings And Imposing Partial Relief, at ¶¶ 3, 10 (Nov. 13, 2003) (Ex. 2 hereto).[5] The putative class, however, includes "all holders of Class B shares of Putnam mutual funds as of October 28, 2003" which are or have been subject to a CDSC. Compl. ¶ 9. As a result, the class necessarily includes some number of investors who purchased their shares after 2000, when, according to the consent orders, "improper trading" had been discovered but had not yet been stopped. *Id.* ¶ 25.

---

[5]     The SEC's November 13 Order is incorporated by reference in the SEC's Order Making Findings and Imposing Supplemental Remedial Sanctions (Apr. 8, 2004), on which Plaintiff relies for its "litany of findings constituting misconduct." Compl. ¶ 23. *See* SEC April 8, 2004 Order (Ex. 2) at § III. The Court may consider this public document in resolving Plaintiff's motion, as Plaintiff himself relies on it in his Complaint. *See, e.g., Jorge v. Rumsfeld,* 404 F.3d 556, 559 (1st Cir. 2005) (motion to dismiss); *Warner v. Atkinson Freight Lines Corp.,* 350 F. Supp. 2d 108, 112 (D. Me. 2004) (considering document "integral to Plaintiff's Complaint" for purposes of deciding motion to remand).

Consequently, the Complaint implicitly alleges misrepresentations by Defendants at the time these individuals purchased their shares. As to them, Plaintiff's theory is that, at the same time Defendants were "contract[ing]" with members of the putative class to make investors' interests Defendants' "highest priority," Compl. ¶¶ 18-19, Defendants knew they were not doing so. *Id.* ¶ 20. Such a claim is plainly "in connection with" the purchase of securities.

The claims in *Dabit* are analogous. There, the plaintiffs sued to recover certain fees and commissions they paid to defendants for investment advice. 395 F.3d at 30. The plaintiffs claimed breach of contract: that, despite their agreement to provide plaintiffs with objective advice, the defendants provided them with biased advice in order to curry favor with investment bankers. *Id.* The defendants removed the case and argued that the claims were preempted by SLUSA. *See id.* at 31. The court agreed, finding that while the complaint was "generally careful to discuss only retention of [securities] during the relevant 'class period,'" it also alleged that misrepresentations were made during the same time. *Id.* at 45-46. "Thus the complaint sweeps in the claim of [putative class members] who purchased the stock during the class period in reliance on the misrepresentations and were damaged thereby." *Id.* at 46.

Other courts have reached similar conclusions. *See Professional Mgmt. Assoc., Inc. Employees' Profit Sharing Plan v. KPMG LLP,* 335 F.3d 800, 803 (8th Cir. 2003) (where plaintiff alleges misrepresentations before he "bought and held" stock, he implicitly alleges misconduct "in connection with" purchase of securities), *cert. denied*, 540 U.S. 1162 (2004); *Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 878 (8th Cir. 2002) (essence of claim is that defendants' misconduct caused plaintiffs to invest in inappropriate securities); *see also Rowinski,* 398 F.3d at 300-02 (question is not whether "misrepresentation" is an element of plaintiff's claim, but "whether the SLUSA elements are 'alleged' in one form or another").

Third, the Complaint specifically alleges that substantial redemptions by shareholders following disclosure of market timing in Putnam funds constitute a breach of contract. Compl. ¶ 3(c) (the "facts and circumstances . . . constitut[ing] a breach of the agreement . . . between defendants and class members" includes "the substantial redemptions by shareholders following the charges being made public"). As redemptions clearly constitute "sales" of securities within the meaning of SLUSA, Plaintiff has alleged misconduct "in connection with" the purchase or sale of securities and his claim is preempted.

### 2. Plaintiff's Proposed Class Includes Individuals Who Redeemed Putnam Funds Shares, And Does Not Exclude Investors Who Purchased Such Shares.

Plaintiff argues that SLUSA's requirements are not met because Plaintiff "limits the proposed class to 'holders' of Class B shares," and therefore his claim "does not arise 'in connection with the purchase or sale' of B shares of Putnam mutual funds." Pl. Mem. at 5. Yet the class definition necessarily includes investors who redeemed Putnam fund shares, and does not exclude investors who purchased such shares, thereby bringing this case squarely within the scope of SLUSA preemption.

While Plaintiff claims his case is brought on behalf of "holders" of Class B shares, the class definition includes all such investors required to pay a CDSC "in the event they redeem such shares prior to the expiration of 6 years from purchase *or have been assessed* a CDSC for redeeming such shares on or after October 28, 2003." Compl. ¶ 9 (emphasis added). The Complaint further alleges that some putative class members already "have been . . . required to pay a significant sales charge." *Id.* ¶ 25.

As a consequence, the class necessarily includes individuals who have "sold" their shares, and who were assessed the charge that Plaintiff now claims should not have applied due to Defendants' alleged misconduct. Compl. ¶¶ 1, 2, 20, 25, 26. Indeed, Plaintiff's claim for

relief also includes a plea for money damages to compensate these individuals for the CDSCs

they paid. *Id.* at 11 (demand that Defendants pay "each Class member their actual damages").

In addition, the putative class alleged in the Complaint could potentially include Putnam

fund purchasers as well. Because the only requirement for membership in the putative class is

that the shareholder held shares of a Fund subject to a CDSC as of October 28, 2003, the class

could also include investors who purchased their such shares (directly or through dividend

reinvestment) during the class period. Indeed, it is an established fact that the vast majority of

mutual fund investors reinvest their dividends by purchasing additional shares of the same

fund.[6]

Including in the class investors who sold shares (and paid the disputed CDSC), and

failing to exclude from the class investors who purchased shares (or purchased additional shares)

during the class period, brings Plaintiff's claim within the scope of SLUSA preemption. As

Judge Stearns has held, "[i]f a class representative could give purchasers and sellers a free ride

by salting into the class a member or two with holding claims, it would be a rare case in which

SLUSA applied at all." *Cape Ann Investors LLC v. Lepone,* 296 F. Supp. 2d 4, 12 n.6 (D. Mass.

2003) (SLUSA applies because class includes both purchasers and holders and complaint "offers

no means of distinguishing" between the two).

Also on point is *Kircher,* where the putative class was defined as all investors in certain

mutual funds who held their shares between two specified dates. 403 F.3d at 482. According to

the Seventh Circuit, "[a]s an effort to evade SLUSA, this class definition is a flop: some of the

investors who held shares during the class period must have purchased their interest (or increased

---

[6]     *See* O'Neal, Purchase and Redemption Patterns of US Equity Mutual Funds, *Financial Management* 63
(Apr. 1, 2004) (almost 90% of mutual fund investors automatically reinvest dividends). Dividend reinvestments
generally are considered "purchases" under the securities laws. *See Deutschman v. Beneficial Corp.,* 761 F. Supp.
1080, 1087 (D. Del. 1991).

it) during that time, others, who owned shares at the beginning of the period, undoubtedly sold some or all of their investment during the window. Each of the funds has substantial daily turnover, so the class of 'all holders' during even a single day contains many purchasers and sellers. All of these class actions therefore must be dismissed." *Id.*

Other cases reach the same result based on similar allegations. For example, in *Rowinski,* the plaintiff claimed the defendants breached their contract with investors by providing biased investment advice, and sought to recover "all fees and charges collected" for that advice. 398 F.3d at 297. The plaintiff argued that "investment research is not necessarily disseminated in connection with the purchase and sale of securities, citing investors who 'hold,' rather than purchase or sell, the recommended securities." *Id.* at 303. The court rejected this argument, and held the claim preempted by SLUSA, because the plaintiff's class definition was not "limited to non-purchasers and non-sellers, and it necessarily encompasses claims by . . . [investors] who purchased or sold the misrepresented securities." *Id. See also Dabit,* 395 F.3d at 45-46 (Complaint did not limit class to investors who purchased securities before misrepresentations, and nothing in complaint excluded claims for damages from purchases thereafter); *Professional Mgmt. Assoc.*, 335 F.3d at 803 (because complaint alleged misrepresentations beginning in 1994 and class members both bought and held shares later, complaint implicitly alleged misrepresentations in connection with the purchase of securities); *Riley,* 292 F.3d at 1345 (SLUSA applies when claim "sweeps within its ambit actual purchases or sales of stock"); *In re Worldcom, Inc.,* 263 F. Supp. 2d 745, 771 (S.D.N.Y. 2003) (SLUSA applies when class definition did not "distinguish between purchasers and holders).[7]

---

[7]     Nor are Plaintiff's cases to the contrary. *See, e.g., Green v. Ameritrade, Inc*., 279 F.3d 590, 598-99 & n.7 (8th Cir. 2002) (no claim by any seller of securities, and express disclaimer of damages arising from any stock transactions); *Feitelberg v. Credit Suisse First Boston LLC*, 2003 WL 22434098, *4-5 (N.D. Cal. 2003) (same); *Shaev v. Claflin*, 2001 WL 548567, *4-5 (N.D. Cal 2001) (claim that new stock options diluted value of shares held

### 3. Plaintiff Could Not Avoid Preemption By Limiting Class To "Holders" Because SLUSA Covers All Claims That Coincide With Purchases Or Sales Of Securities.

Even if Plaintiff had limited his claim to "holders," which he did not, it would still be preempted because SLUSA covers all claims of misconduct "in connection with" the purchase and sale of securities, not just claims asserted by individuals who themselves have purchased and sold. The opinion in *Kircher* makes this clear.

In *Kircher*, investors sued several investment companies for failing to ensure that their funds' share prices were set accurately each day. This allegedly allowed market timers to buy shares when they were overpriced and sell shares when they were underpriced, thereby "diverting gains from the mutual funds' long-term investors." 403 F.3d at 481. Several cases were consolidated for the appeal, and in all but one the plaintiffs implicitly had alleged that their purchases coincided with certain misrepresentations and omissions by the defendants regarding market timing. *Id.* 482-83. As discussed above, the court of appeals found these allegations sufficient to bring the cases within the scope of SLUSA. *Id.*

In the remaining case, however, plaintiffs had "define[d] the class as all investors who held the fund's securities during a defined period and neither purchased nor sold shares during that period." *Kircher,* 403 F.3d at 483. The Seventh Circuit found the case was nevertheless preempted by SLUSA. According to the court, the "in connection with" language of SLUSA has the same meaning as the same language in Section 10(b) of the Securities Exchange Act of 1934, the purpose of which is to "ensure[] that the fraud occurs in securities transactions rather than some other activity." *Id.* (citing *SEC v. Zandford,* 535 U.S. 813, 821-22 (2002)). That language, moreover, includes no requirement that a plaintiff "purchased or sold securities," and thus no

---

by *existing* owners of stock); *Gordon v. Buntrock*, 2000 WL 556763, *1 (N.D. Ill. 2000) (class composed of investors who bought stock *before* and held stock until *after* period when misrepresentations made).

such limitation exists on the cases that are preempted by SLUSA. *Id.* While the court recognized that, in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975), the Supreme Court had limited the private right of action under Section 10(b) of the Exchange Act to claims brought by purchasers and sellers of securities, it held that later cases decided by the Supreme Court made clear that the language of Section 10(b) itself was not so limited. *Id.* at 483-84 (citing *United States v. O'Hagan,* 521 U.S. 642, 664 (1997), *Holmes v. SIPC,* 503 U.S. 258, 284 (1992), and *United States v. Naftalin,* 441 U.S. 768, 774 n.6 (1979)).

As discussed above, Plaintiff's efforts to avoid SLUSA preemption by alleging that his claim is brought exclusively on behalf of "holders" are undermined by the allegations in his own Complaint. Nor could those efforts succeed in any event because, under *Kircher,* SLUSA preempts claims of misconduct "in connection with the purchase or sale of securities" regardless of whether the plaintiffs bought and sold the securities involved. As the Seventh Circuit held in *Kircher,* "plaintiffs' effort to define non-purchaser-non-seller classes is designed to evade PSLRA in order to litigate a securities class action in state court in the hope that a local judge or jury may produce an idiosyncratic award. It is the very sort of maneuver that SLUSA is designed to prevent." *Kircher,* 403 F.3d at 484. The same is true in this case.

## II.    **The Complaint Presents Substantial Federal Questions.**

The Motion to Remand should also be denied because the Complaint presents substantial federal questions over which this Court has jurisdiction.

While Plaintiff argues that the Investment Company Act of 1940 ("ICA") "does not preempt state law claims," Pl. Mem. at 7, removal is not limited to cases where a federal statute expressly authorizes it. Instead, a state law claim may still "arise under" federal law when its resolution requires the determination of a substantial question of federal law. *Rossello-Gonzalez*

*v. Calderon-Serra,* 398 F.3d 1, 12-13 (1st Cir. 2004); *see also Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983) (claim arises under federal law if the plaintiff's "right to relief under state law requires the resolution of a substantial question of federal law").[8]

First, resolution of Plaintiff's claim requires a determination of whether Defendants have committed any "wrongdoing" under federal law. As discussed above, Plaintiff's claim of breach is expressly founded on the allegations contained in the SEC consent orders. It is the "litany of findings constituting misconduct" in these orders that Plaintiff says relieves him of his obligation to pay the CDSC. Compl. ¶ 3, 23, 26, 31.[9] State law claims founded on alleged violations of federal law raise substantial federal questions. *See, e.g., D'Alessio v. New York Stock Exchange, Inc.,* 258 F.3d 93, 101-02 (2d Cir.) (where "central premise" of claim is "rooted in violations of federal law . . . [and] requires court to construe federal securities laws . . . . the federal issue is substantial"), *cert. denied*, 534 U.S. 1066 (2001); *Marcus v. AT&T Corp.,* 138 F.3d 46, 55-56 (2d Cir. 1998) (state law breach of warranty claim that seeks enforcement of tariff agreements created under federal law); *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 827 (2d Cir. 1964) ("Even though the claim is created by state law, a case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law.").

Second, any resolution of Plaintiff's claim would require a court to construe the SEC Orders, and granting Plaintiff the remedy he seeks would potentially conflict with them. Indeed, those Orders expressly require payment of "the monetary amounts necessary to fairly compensate Putnam funds' shareholders for losses attributable to excessive short-term trading

---

[8]     Plaintiff's cases are irrelevant to this question. *Burks v. Lasker*, 441 U.S. 471 (1979), says nothing about removal jurisdiction. Instead, it holds that the rights of mutual fund trustees to consider whether to dismiss a shareholder derivative suit brought under the ICA are governed under state, not federal, law. *Id.* at 486. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214 (3d Cir. 2001), merely holds that state law breach of fiduciary duty claims do not interfere with the legislative goals behind § 36(b) of the ICA. *Id.* at 223.

[9]     As noted in the SEC's April 8, 2004 Order, the conduct alleged in the state consent order is "identical to that found" in the SEC's November 13, 2003 Order. *See* SEC April 8, 2004 Order (Ex. 2) at § III.

and market-timing trading activity by Putnam employees," SEC Nov. 13, 2003 Order (Ex. 2) at § IV.E.1, and require a further payment of $50 million over and above the actual, calculated restitutionary amount. SEC Apr. 8, 2004 Order (Ex. 2) at § IV.A. The orders make no provision for the cancellation of Class B shareholders' obligation to pay the CDSC. Indeed, granting such relief would provide Plaintiff and the putative class with a double recovery, and conflict with the intent of the consent orders to fully compensate shareholders for their losses. For this reason, too, Plaintiff's claim presents a substantial federal question that warrants removal. *See, e.g., Sable v. General Motors Corp.,* 90 F.3d 171, 175 (6th Cir. 1996).

Finally, Plaintiff's claim threatens to undermine key elements of federal law regarding the sale of mutual fund shares. Indeed, while Plaintiff claims that the CDSC is a "penalty" that shareholders have to pay, *see* Compl. ¶¶ 2, 20, it is actually a means through which financial intermediaries are compensated for services relating to the distribution of mutual fund shares. *See ING Funds,* 2005 WL 1107072, at *1. More importantly, the CDSC is part of an extensive body of federal law through which mutual fund shares are marketed. That body of law, which is rooted in the ICA, *see* 15 U.S.C. § 80a-22, and applicable to sales of mutual funds nationwide, *see* 17 C.F.R. §§ 270.12b-1, 270.22d-1, includes detailed rules for disclosing and assessing sales loads, including CDSCs. These rules ensure that sufficient resources are generated to pay the cost of distributing fund shares, and that Class B shareholders, who pay no front-end sales load when they purchase their shares, understand that they may be required to pay a CDSC upon redemption instead. *Id. See also* NASD, Inc., NASD Manual (CCH) § 2830 (2005). The rules also require that loads be applied equally within share classes, or pursuant to uniform scheduled variations, and consistent with disclosures to shareholders. *Id. See also* 15 U.S.C. § 80a-22(d); 17 C.F.R. § 270.22d-1. Plaintiff effectively seeks to exempt himself (and the putative class)

from this carefully constructed regulatory scheme based on allegations of market timing in the Putnam funds.

Through the PSLRA, SLUSA and the National Securities Markets Improvements Act of 1996 ("NSMIA"), "Congress intended to provide national, uniform standards for the securities markets and nationally marketed securities." *Lander,* 251 F.3d at 111. The federal regulatory regime governing the distribution of mutual fund shares leaves no room for inconsistent, *ad hoc* exemptions and carve-outs, particularly on claims for alleged misconduct that the SEC has already ensured will be completely remedied. For this reason, Plaintiff's claim "necessarily depends on resolution of a substantial question of federal law," and is removable under 28 U.S.C. § 1441 in addition to SLUSA. *See Franchise Tax Bd.,* 463 U.S. at 8-9; *see also Myers v. Merrill Lynch & Co.,* 1999 WL 696082 (N.D. Cal. 1999) (NSMIA preempts claims under state statutes that conflict with federal securities rules), *aff'd*, 249 F.3d 1087 (9th Cir. 2001).

## III.    This Case Is Distinguishable from *Meyer v. Putnam International Voyager Fund*.

Last year, in *Meyer v Putnam International Voyager Fund,* 220 F.R.D. 127 (D. Mass. 2004), Judge Young ruled that SLUSA did not preempt "market timing" claims made by other plaintiffs against certain Putnam investment companies, and that the federal questions presented in the claims were not substantial enough to warrant removal. That ruling is distinguishable.

As in this case, the dispositive issue in *Meyer* with respect to SLUSA was whether the plaintiffs' claims were "in connection with" the purchase and sale of securities.[10] There, as here, the plaintiffs claimed solely to be "holders" of Putnam fund shares. 220 F.R.D. at 129. However, that case involved claims that the defendants had allowed market timers to "capture[]

---

[10]    The plaintiffs in *Meyer* also argued that their complaint did not include any claims of "misrepresentation or omission." 220 F.R.D. at 129 n.1. While Judge Young's ruling on the "in connection with" requirement meant that he did not have to consider this argument, he noted that references in the complaint to "unsuspecting" class members, and the defendants' policy against market timing "might be fairly construed as "the 'allegations of misrepresentations or omissions' that Meyer denies making." *Id.*

an arbitrage profit which comes dollar-for-dollar out of the pockets of long-term investors," which the plaintiffs claimed harmed them by reducing the value of the shares they held. *See Meyer* Complaint, No. 03-12214-WGY, ¶¶ 29, 79 (available on PACER) ("Plaintiff and the other members of the Class have been injured by defendants' wrongdoing . . . because . . . the NAV or price of shares of [Plaintiff's funds] were lower than they might have otherwise been."). In contrast, the claim in the instant case involves fees that were agreed to as part of Plaintiff's *purchase* of his shares, and the harm alleged arises only when Plaintiff *redeems* those shares. Therefore, unlike the claim in *Meyer*, Plaintiff's claim here is *necessarily* "connected to" both purchase and sale of securities. *See Dabit,* 395 F.3d at 48.

Nor did the plaintiffs in *Meyer* expressly rely on any purchases or redemptions of mutual fund shares in asserting their claims. In contrast, Plaintiff here expressly bases his claim of breach on "substantial *redemptions* by shareholders . . . [and] increased outflow of shareholder funds" resulting from those redemptions. Compl. ¶ 3 (emphasis added). Hence, Plaintiff's claim here "coincides with" securities transactions.

The court in *Meyer* also found that the language in Meyer's complaint was "sufficiently clear to exclude claims asserted in connection with the purchase or sale of the Funds." *Id.* at 129. The court's understanding on this point was enhanced by the fact that Meyer, in his motion to remand, had expressly renounced any claim "that plaintiff bought or sold covered securities in reliance on defendants' alleged misrepresentations." *Id.* In this case, the Complaint expressly *includes* claims by shareholders who have already been assessed a CDSC, and does not *exclude* claims by shareholders who purchased shares (or additional shares) after October 28, 2003.

*Meyer* was also decided before the recent rulings in *Kircher*, *Rowinski*, and *Dabit*. As discussed above, these cases all counsel that courts should carefully review purported state law

claims to determine whether they encompass claims by purchasers or sellers of securities.
Indeed, under *Kircher*, the critical issue is whether the alleged misconduct coincides with the
purchase or sale of securities, and not whether it coincides with a plaintiff's purchase and sale.

With respect to federal question removal, Judge Young found that, at most, federal law
provided a "element" of the plaintiff's state law cause of action. 220 F.R.D. at 130. In this case,
Plaintiff relies entirely on the violation of federal law as the basis for his claim, and the relief he
seeks would both interfere with federal consent orders designed to remedy the harms he alleges
and graft an *ad hoc* exception on to the federal body of law regarding the distribution of mutual
fund shares. None of these issues were factors in *Meyer*.

## <u>CONCLUSION</u>

For the reasons set forth herein and in defendants' Notice of Removal, plaintiff's Motion
to Remand should be denied.

Dated: June 20, 2005                     Respectfully submitted,

                                         <u>/s/ John D. Donovan, Jr.</u>
                                         John D. Donovan, Jr. (BBO#130950)
                                         Carisa Klemeyer
                                         ROPES & GRAY LLP
                                         One International Place
                                         Boston, MA  02110-0624
                                         Telephone: (617) 951-7000
                                         Fax: (617) 951-7050

                                         Thomas B. Smith
                                         ROPES & GRAY LLP
                                         One Metro Center
                                         700 12th Street, NW, Suite 900
                                         Washington, DC 20005-3948
                                         Telephone: (202) 508-4600
                                         Fax: (202) 508-4650

                                         Counsel for ALL DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served on the attorney of record for each party in this matter by filing the document electronically with this Court, using the Court's ECF filing system, on this 20th day of June, 2005.

<u>/s/  John D. Donovan, Jr.</u>
John D. Donovan, Jr.

# EXHIBIT 1

**JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED**

**JUNE 14, 2005**

**MICHAEL J. BECK
CLERK OF THE PANEL**

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

# WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

## FIRST AMENDMENT TO THE HEARING SESSION ORDER AND ATTACHED SCHEDULE FILED JUNE 14, 2005

IT IS ORDERED that the Hearing Session Order and attached Schedule filed by the Judicial Panel on Multidistrict Litigation on June 14, 2005, are amended to include the following matter on Section B of the Schedule for the hearing session on July 28, 2005, in Denver, Colorado:

MDL-1586 -- In re Mutual Funds Investment Litigation

Opposition of plaintiff Adam Press to transfer of the following action to the United States District Court for the District of Maryland:

District of Massachusetts

*Adam Press v. Putnam Investment Funds, et al.*, C.A. No. 1:05-10923

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# EXHIBIT 2

Putnam Investment Management, LLC: Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 1 of 17

Case 1:05-cv-10923-NG    Document 10-2    Filed 06/20/2005    Page 4 of 23



**U.S. Securities and Exchange Commission**

## UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 2192 / November 13, 2003**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 26255 / November 13, 2003**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-11317**

| | |
|---|---|
| In The Matter of<br><br>PUTNAM INVESTMENT MANAGEMENT, LLC<br><br>Respondent. | : ORDER MAKING FINDINGS AND IMPOSING PARTIAL<br>: RELIEF, INCLUDING A FINAL CENSURE, REMEDIAL<br>: UNDERTAKINGS AND A CEASE AND DESIST ORDER<br>: PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE<br>: INVESTMENT ADVISERS ACT OF 1940 AND SECTIONS 9<br>: (b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF<br>: 1940 |

### I.

The Securities and Exchange Commission ("Commission") instituted administrative and cease and desist proceedings pursuant to Sections 203 (e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Putnam Investment Management, LLC ("Putnam" or "Respondent") on October 28, 2003.

### II.

Respondent has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings and the findings contained in paragraphs 1 and 4 of Section III below, which are admitted, Respondent consents to the entry of this Order Making Findings and Imposing Partial Relief, Including a Final Censure, Remedial Undertakings and a Cease-and-Desist Order Pursuant To Sections 203(e) and 203(k) of the Advisers Act and Sections 9(b) and 9(f) of the Investment Company Act

Putnam Investment Management LLC: Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 2 of 17

Case 1:05-cv-11932-NG Document 10-2 Filed 06/20/2005 Page 5 of 25

("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Overview

1. This is a proceeding against Putnam Investment Management LLC, a registered investment adviser located in Boston, Massachusetts. Putnam manages the Putnam Family of Funds, a complex of mutual funds.

2. Beginning in at least 1998, at least six Putnam employees who worked as investment management professionals engaged in excessive short-term trading of Putnam mutual funds in their personal accounts. Four of those employees engaged in such trading in funds over which they had investment decision-making responsibility and had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. Short-term trading of mutual fund shares can adversely affect mutual fund shareholders because, among other things, it can dilute the value of their shares, raise transaction costs for the fund, disrupt a fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance. Consequently, mutual fund managers such as Putnam, among other things, often maintain policies and procedures to detect and prevent short-term trading.

3. By at least early 2000, Putnam became aware that several investment management employees were engaging in potentially self-dealing short-term trading of mutual fund shares in their personal accounts. However, Putnam failed to disclose this potentially self-dealing securities trading to the boards of the mutual funds it managed and to the funds' shareholders. Moreover, Putnam also failed to take adequate steps to detect and deter such trading activity through its own internal controls and its supervision of investment management professionals. By virtue of this conduct, Putnam violated its fiduciary duties to Putnam's family of mutual funds in violation of, among other things, the antifraud provisions of the Advisers Act.

### Respondent

4. **Putnam Investment Management LLC** (File No. 801-7974), a Delaware limited liability company, is an indirect wholly-owned subsidiary of Putnam Investment Management Trust, which is an indirect wholly-owned subsidiary of Marsh & McLennan Companies, Inc. ("MMCI"). MMCI is a publicly-owned holding company traded on the New York Stock Exchange, whose operating subsidiaries are international insurance brokers, investmentmanagers, and management consultants. Putnam Investment Management LLC is the investment adviser for the Putnam Family of Funds and is the sub-adviser to 38 unaffiliated institutional portfolios. As of September 30, 2003, Putnam managed approximately $272 billion.

Putnam Investment Management, LLC: Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 3 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 6 of 23

**Other Relevant Persons**

5. **Justin M. Scott**, age 46, joined Putnam in 1988. Scott was managing director and chief investment officer of the International Equities Group for Putnam. Previously, he was an executive director and portfolio manager with Lazard Investors in London, England from 1981 to 1988. Scott is a resident of Marblehead, Massachusetts.

6. **Omid Kamshad**, age 41, joined Putnam in 1996. During the relevant time period, he served as managing director and chief investment officer of the International Core Equity Group for Putnam. Before joining Putnam, Kamshad worked at a number of investment firms as a portfolio manager and director of European equities. Kamshad is a resident of Weston, Massachusetts.

**Background**

7. Between 1998 and 2003, Justin M. Scott, managing director and chief investment officer of the International Equities Group, and Omid Kamshad, managing director and chief investment officer of the International Core Equity Group, engaged in repeated short-term trading of Putnam mutual funds. Both Scott and Kamshad engaged in short-term trading in their personal accounts of mutual funds over which they had investment decision-making responsibility and about which they had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

8. In addition, four other Putnam employees also engaged in excessive short-term trading of Putnam funds in their personal accounts. Two of these employees, like Scott and Kamshad, traded in funds over which they had investment decision-making responsibility and access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. In total, between 1998 and 2003, short-term trading by these six employees generated more than $1 million in gross personal gains.

9. Until 2000, these employees' short-term trading went unchecked by Putnam altogether, which had minimal controls in place to detect and deter such trading. Even after Putnam imposed some controls on employee trading in 2001, Kamshad continued to make short-term exchanges without being warned, let alone stopped, by Putnam.

10. Putnam has known since at least 2000 that certain of its investment professionals were engaging in short-term trading of Putnam funds in their personal accounts. Yet, until on or about October 24, 2003, Putnam failed to disclose these potentially self-dealing transactions to fund boards and to fund shareholders.

11. On or about October 24, 2003, Putnam issued a press release disclosing the employee trading for the first time. That release stated that Putnam was aware of:

   . . . short-term trading activity by a small number of our own

Putnam Investment Management, LLC: Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 4 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 7 of 25

employees which we had detected in 2000. Some of this
activity appears to have been market timing. In some cases,
the activity involved investment professionals trading in funds
under their supervision . . . .

### Omid Kamshad's Short-Term Trading

12. Kamshad was chief investment officer for international equity at
Putnam since early 2002. During the relevant time period, he was a
portfolio manager for at least seven mutual funds whose portfolios
contained international securities. By virtue of his position at Putnam,
Kamshad had access to non-public information regarding, among other
things, current portfolio holdings, valuations and transactions not readily
available to all fund shareholders.

13. Between 1998 and 2003, Kamshad engaged in at least 38 "round trip"
trades of Putnam funds, including at least four funds he participated in
managing.2 In these "round trip" trades, Kamshad sold shares an average
of only 13 trading days after purchasing shares in a fund and often sold
shares only three or fewer trading days after purchases. As a result of his
short-term trading, Kamshad realized hundreds of thousands of dollars in
gains. Kamshad typically traded hundreds of thousands of dollars worth of
fund shares, and on at least one occasion, the value of his short-term trade
exceeded $1 million.

14. In January 2000, senior Putnam executives learned of "large and
frequent movement" of Putnam funds by Kamshad, who at the time served
as lead portfolio manager on Putnam's International Equity and Europe
Equity funds. At that time, Kamshad's trading came to the attention of
senior managers in Putnam's retirement plan group. On January 25, 2000,
the director of Putnam's employee relations and staffing unit discussed with
Kamshad his frequent trading, and Kamshad said he would cease that type
and level of activity. On February 18, 2000, the director issued a
memorandum to the file confirming this conversation.

15. Following this discussion, Kamshad continued to engage in short-term
trading in Putnam funds. Between February and April 2000, Kamshad made
at least nine more round trip trades.

16. Subsequently, in mid-2000, a senior executive at Putnam held a
meeting with investment professionals in which he stated that Putnam
employees must not engage in short-term trading in Putnam funds and told
them that their trading must be beyond reproach. Kamshad, like other
Putnam portfolio managers, attended this meeting.

17. Despite the admonitions at that meeting, Kamshad again continued to
engage in short-term trading. Between August 2000 and September 2000,
he made seven more round trip trades. As recently as March 2003,
Kamshad purchased more than $850,000 worth of shares in Europe Equity,
a fund on which he was the lead manager. Four trading days later, he sold
Europe Equity shares, garnering a profit of more than $79,000. In total,
Kamshad engaged in at least 20 short-term round trip trades after he was
warned about his conduct.

### Justin M. Scott's Short-Term Trading

18. Scott was chief investment officer of the international equities group at Putnam. During the relevant time period, he was a portfolio manager for at least five mutual funds whose portfolios contained international securities. By virtue of his position at Putnam, Scott had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

19. Between 1998 and 2000, he engaged in approximately 35 round trip trades in Putnam funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in which he bought and sold mutual fund shares on consecutive days. As a result of his short-term trading, Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of mutual fund shares.

20. On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum regarding Kamshad's short-term trading. The memorandum, which addresses the warning given to Kamshad in January 2000, makes clear that short-term trading in large amounts was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds."

21. Nonetheless, Scott continued to engage in short term trades. Between March and May of 2000, Scott made more than 20 round trip trades, including 10 "next day" round trip trades in Putnam funds.

### Other Employee Trading

22. Other Putnam employees also engaged in improper market timing and other short-term trading of Putnam funds in their personal accounts. Between 2000 and 2001, a Putnam analyst and member of portfolio management teams of international funds, made approximately 49 round trip trades of Putnam mutual funds, including funds for which he had some responsibility. During the period 2000 to 2002, an international fund portfolio manager made approximately 45 round trip trades of Putnam mutual funds, including at least one fund in which she participated in managing. During the period 2000 to 2003, a co-manager of certain Putnam funds made approximately 36 round trips of Putnam mutual funds, although none appear to have been in funds he managed. Finally, in 2000, an equities analyst made approximately 48 round trip trades of Putnam mutual funds.

### Putnam Lacks Controls Dedicated to
### Detecting and Deterring Short-Term Trading By Employees

23. Although Putnam has engaged in some efforts to detect and deter short term trading in its complex of funds, these efforts failed to prevent its own employees from engaging in short-term trading in Putnam funds.

24. In 1999, Putnam set up a staff of market timing analysts responsible

for monitoring and preventing short-term trading activity at Putnam. This department, colloquially referred to as the "market timing police," was typically staffed by two or three analysts. The market timing police relied on several "screens" that were intended to analyze trading activity and alert Putnam to possible market timing activity.

25. Until 2000, however, there were minimal controls against short-term trading by Putnam's own employees in their Putnam retirement or compensation plans. In particular, there were little or no direct controls dedicated to preventing market timing by investment professionals in funds over which they had management responsibility. Even after 2000, Putnam's system for detecting and preventing market timing by its own employees was fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever.

26. In early 2000, Kamshad's trading came to the attention of the market timing police, who then relayed it to the Putnam group that oversees Putnam's own retirement and compensation plans. Until October 2003, however, no disciplinary action was taken against any employee for engaging in market timing or other short-term trading. Until October 2003, Putnam and its portfolio managers did not inform fund boards or fund shareholders of the improper employee trading.

27. Instead, Putnam attempted to address the problem in mid-2000 by holding a meeting of high-level staff, in which senior investment professionals were told not to engage in excessive short-term trading.

28. In 2001, Putnam implemented a control designed to detect and curb fund timing by all Putnam employees. Beginning in 2001, Putnam conducted an annual review of employee trading frequency. However, the review process focused only on one fiscal quarter's worth of trades in Putnam's 401(k) and compensation plans each year. By design, the review could not capture market timing by an employee unless the trading occurred during the one quarter that was selected. Moreover, trading would be examined only if Putnam detected at least eight trades in the quarter. No special scrutiny was given to portfolio managers or other investment professionals.

29. If market timing was detected, the employee was issued written warnings stating that the employee risked losing their exchange privileges in the future if the trading activity did not stop. Even for employees who received warning letters, however, Putnam failed to review trading activity again for one year.

30. In April 2002 -- two years after first learning of market timing by investment professionals in funds they helped manage -- Putnam amended its Code of Ethics to include a prohibition on employee market timing of Putnam funds. At no time, even after amending its Code of Ethics, did Putnam disclose the employee market timing to fund boards or to fund shareholders, until the October 2003 press release described above.

## Violations

Putnam Investment Management, LLC: Admin. Proc. Rel. No. IA-2192 / November 13, 2...   Page 7 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 10 of 25

31. As a result of the conduct described in section III above, Putnam willfully violated Sections 206(1) and 206(2) of the Advisers Act in that it, while acting as an investment adviser, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, Putnam knowingly, recklessly, and/or negligently failed to disclose to the boards of mutual funds it managed that certain investment management professionals were engaging in potentially self-dealing short-term securities trading. Accordingly, Putnam willfully violated Sections 206(1) and 206(2) of the Advisers Act.

32. As a result of the conduct described in section III above, Putnam willfully violated Section 204A of the Advisers Act in that it, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse of material, nonpublic information by such investment adviser or any person associated with such investment adviser. Putnam failed to take adequate steps to detect and deter short-term trading of Putnam funds by its portfolio managers and other investment professionals who had access to non-public information regarding, among other things, current portfolio holdings, valuations andtransactions not readily available to all fund shareholders. Accordingly, Putnam willfully violated Section 204A of the Advisers Act.

33. Rule 17j-l(c), promulgated under Section 17(j) of the Investment Company Act, requires every registered investment company, and its investment adviser, to, among other things, use reasonable diligence and institute procedures reasonably necessary to prevent violations of their code of ethics. After prohibiting market timing in its code of ethics in 2002, Putnam failed to use reasonable controls to monitor and detect such activity by its employees. Accordingly, Putnam willfully violated Section 17 (j) of the Investment Company Act and Rule 17j-1(c) thereunder.

34. As a result of the conduct described in section III above, Putnam failed reasonably to supervise certain employees, including Scott and Kamshad, who were persons subject to Putnam's supervision, with a view to preventing their violations of Sections 206(1) and 206(2) of the Advisers Act. Putnam failed to adopt and implement procedures reasonably designed to detect or prevent the violations of Scott, Kamshad and other employees. Accordingly, Putnam failed reasonably to supervise within the meaning of Section 203(e)(6) of the Advisers Act.

35. In determining to accept the Offer, the Commission considered cooperation afforded the Commission staff by Putnam during its investigation.

### Certain Remedial Efforts and Undertakings by the Putnam Funds

36. In determining to accept the Offer, the Commission considered the fact that the independent Trustees of the Putnam funds have undertaken a special investigation of matters related to late trading and market timing. In determining to accept the Offer, the Commission further considered the following efforts voluntarily undertaken by the Putnam funds:

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 8 of 17

Case 1:05-cv-10923-NG     Document 10-2     Filed 06/20/2005     Page 11 of 25

a. The Putnam funds will operate in accordance with the following governance policies and practices, which the funds have represented are currently in effect:

   i. no more than 25 percent of the members of the board of Trustees of any Putnam fund will be persons who either (a) were directors, officers or employees of Putnam at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company Act, of the fund or of Putnam. In the event that the board of Trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent Trustee, the independent Trustees will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

   ii. no chairman of the board of Trustees of any Putnam fund will either (a) have been a director, officer or employee of Putnam at any point during the preceding 10 years or (b) be an interested person, as defined in the Investment Company Act, of the fund or of Putnam; and

   iii. any person who acts as counsel to the independent Trustees of any Putnam fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act and will not have any employment, consultant, attorney-client, auditing or other professional relationship with Putnam.

b. The board of Trustees will continue to maintain separate committees primarily dedicated to the oversight of the investment operations of particular categories of funds. Persons who either (a) were directors, officers or employees of Putnam at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company Act, of the fund or of Putnam will not comprise a majority of, or serve as chairman of, any such committee. Each such committee will, among its duties, identify any compliance issues that are unique to the category of funds under its review and work with the appropriate board committees (e.g. the Audit and Pricing Committee) to ensure that any such issues are properly addressed.

c. No action will be taken by the board of Trustees or by any committee thereof unless such action is approved by a majority of the members of the board of Trustees or of such committee, as the case may be, who are not either (i) persons who were directors, officers or employees of Putnam at any point during the preceding 10 years or (ii) interested persons, as defined in the Investment Company Act, of the fund or of Putnam. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent Trustees of a fund is not approved by the full board of Trustees, the fund will disclose such proposal and the related board vote in its shareholder report for such period.

d. Commencing in 2004 and not less than every fifth calendar year thereafter, each Putnam fund will hold a meeting of shareholders at which the board of Trustees will be elected.

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2192 / November 13, 2... Page 9 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 12 of 25

e. Each Putnam fund will designate a member of the independent administrative staff reporting to its board of Trustees as being responsible for assisting the board of Trustees and any of its committees in monitoring compliance by Putnam with the federal securities laws, its fiduciary dutiesto fund shareholders and its Code of Ethics in all matters relevant to the operation of the Putnam funds. The duties of this staff member will include reviewing all compliance reports furnished to the board of Trustees or its committees by Putnam, attending meetings of Putnam's Internal Compliance Controls Committee to be established pursuant to Putnam's undertakings set forth in Part IV below, serving as liaison between the board of Trustees and its committees and the Chief Compliance Officer of Putnam, making such recommendations to the board of Trustees regarding Putnam's compliance procedures as may appear advisable from time to time, and promptly reporting to the board of Trustees any material breach of fiduciary duty, breach of the Code of Ethics and/or violation of the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties.

## IV.

In view of the foregoing, the Commission deems it appropriate in the public interest and for the protection of investors to impose the sanctions agreed to in Putnam's Offer. Accordingly, it is hereby ORDERED, effective immediately, that:

A. Pursuant to Section 203(e) of the Advisers Act, Putnam is hereby censured; and

B. Pursuant to Section 203(k) of the Advisers Act and Section 9(f) of the Investment Company Act, Putnam shall cease and desist from committing or causing any violations and any future violations of Sections 204A, 206(1) and 206(2) of the Advisers Act and Rule 17j-l (c), promulgated under Section 17(j) of the Investment Company Act.

## **Undertakings**

C. <u>Employee Trading Restrictions</u>. Putnam (which for this purpose includes any broker-dealer affiliate that acts as principal underwriter for any of the open-end mutual funds advised by Putnam) shall comply with the following undertakings:

1. Putnam shall require, from and after January 1, 2004, that all Putnam employees placing purchase orders in shares of open-end funds in the Putnam group of investment companies ("Putnam funds") or seeking to redeem or exchange shares of Putnam funds purchased after January 1, 2004 to place such orders through Putnam. Putnam shall add the foregoing requirement to the Code of Ethics maintained by Putnam pursuant to Rule 17j-1 under theInvestment Company Act of 1940. Putnam shall use its best efforts to cause its employees to transfer any shares in Putnam funds held in accounts outside of Putnam to accounts maintained at Putnam, other than retirement, pension, deferred compensation and similar

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2192 / November 13 . . . Page 10 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 13 of 25

accounts required to be maintained by third party administrators.

"Putnam employee" includes members of the immediate family of a Putnam employee who share the same household as the Putnam employee or for whom the Putnam employee has investment discretion ("family member"), any trust in which a Putnam employee or family member is a trustee with investment discretion and in which such Putnam employee or any family member are collectively beneficiaries, any closely-held entity (such as a partnership, limited liability company or corporation) in which a Putnam employee and his or her family members hold a controlling interest and with respect to which they have investment discretion, and any account (including any retirement, pension, deferred compensation or similar account) in which a Putnam employee or family member has a substantial economic interest and over which said Putnam employee or family member exercise investment discretion.

2. Putnam shall require all Putnam employees to hold any investments they may make in Putnam funds, excluding taxable and tax-exempt money market funds and other short term domestic fixed income funds designed to permit short term investment, for a minimum of 90 calendar days. Putnam's Code of Ethics Oversight Committee may grant exceptions to this 90-day holding period as a result of death, disability or other special circumstances (such as automatic investment and withdrawal programs and periodic rebalancing), all as determined from time to time by such Committee. Putnam shall ensure that any exceptions from the 90-day holding period granted by Putnam's Code of Ethics Oversight Committee are reported to the independent Trustees of the Putnam funds with such frequency as such Trustees request. Putnam shall add the foregoing holding period requirement to the Code of Ethics maintained by Putnam pursuant to Rule 17j-1 under the Investment Company Act.

3. Putnam shall require all Putnam investment employees to hold any investments they may make in Putnam funds or in other registered funds for which Putnam acts as an investment adviser for which they have sole or shared supervisory or portfolio managementresponsibility, excluding taxable and tax-exempt money market funds and other short term domestic fixed income funds designed to permit short term investment, for a minimum of one year. Putnam's Code of Ethics Oversight Committee may grant exceptions to this one-year holding period as a result of death, disability or other special circumstances (such as automatic investment and withdrawal programs and periodic rebalancing), all as determined from time to time by such Committee. Putnam shall ensure that any exceptions from the one-year holding period granted by Putnam's Code of Ethics Oversight Committee are reported to the independent Trustees of the Putnam funds with such frequency as such Trustees request. Putnam shall add the foregoing holding period requirement to the Code of Ethics

maintained by Putnam pursuant to Rule 17j-1 under the Investment Company Act.

For purposes of the foregoing undertaking, "Putnam investment employee" includes all employees of Putnam's Investment Division, all other employees who, in connection with their regular duties, have access to information regarding portfolio holdings, valuations and transactions, and members of the immediate family of all such employees who share the same household as the Putnam investment employee or for whom the Putnam investment employee has investment discretion ("family member"), any trust in which a Putnam investment employee or family member is a trustee with investment discretion and in which such Putnam investment employee or any family member are collectively beneficiaries, any closely-held entity (such as a partnership, limited liability company or corporation) in which a Putnam investment employee and his or her family members hold a controlling interest and with respect to which they have investment discretion, and any account (including any retirement, pension, deferred compensation or similar account) in which a Putnam investment employee or family member has a substantial economic interest and over which said Putnam investment employee or family member exercise investment discretion.

4. To the extent any Putnam employee is granted an exception to the holding periods pursuant to sections IV.C.2 and IV.C.3 above, Putnam shall take all actions necessary to permit the application by the Putnam funds of a redemption fee on any exchange within 90 days by such employee in an amount equal to that imposed on anysimilarly situated investors and in no event less than 1.00% of the total redemption amount (calculated at market value).

D. <u>Employee Trading Compliance</u>. Putnam (which for this purpose includes any broker-dealer affiliate that acts as principal underwriter for any of the open-end mutual funds advised by Putnam) shall comply with the following undertakings:

1. Putnam shall require that employee trading compliance be reviewed by Putnam's Chief Compliance Officer or a member of his or her staff and that employee trading compliance violations be reported to the Code of Ethics Oversight Committee for the imposition of an appropriate sanction. The minimum sanction for an initial violation shall be disgorgement of any profit on a redemption from a Putnam fund that is made prior to the expiration of either the 90-day or the one-year holding period, whichever is applicable. Putnam shall add the foregoing sanction provision to the Code of Ethics maintained by Putnam pursuant to Rule 17j-1 under the Investment Company Act. Putnam shall provide a report of any compliance sanctions with respect to either the 90-day or one-year holding periods to the independent Trustees of the Putnam funds with such frequency as the Trustees of such funds request, and in any event at least quarterly.

Putnam Investment Management, LLC Admin. Proc. Rel. No. IA-2192 / November 13... Page 12 of 17

Case 1:05-cv-10923-NG    Document 10-2    Filed 06/20/2005    Page 15 of 25

2. Putnam shall use its reasonable best efforts to build within a reasonable time following the date of this Order an automated system that will prevent on a pre-trade basis redemptions by Putnam employees from their investments in Putnam funds that are maintained on Putnam's recordkeeping systems before expiration of the 90-day or one-year holding periods, as applicable.

3. Putnam shall transfer responsibility for employee trading compliance from the Putnam Human Resources Department to the Putnam Legal and Compliance Department under the supervision of Putnam's Chief Compliance Officer, and shall complete said transfer by no later than December 31, 2003.

4. Putnam shall establish and staff a full-time senior-level position whose responsibilities shall be principally concerned with compliance matters related to personal investing by Putnam employees. This officer will report directly to the Chief Compliance Officer of Putnam.

5. Putnam shall require the Chief Compliance Officer of Putnam to report to the independent Trustees of the Putnam funds any breach of fiduciary duty and/or the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent Trustees may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable Trustee) shall be reported promptly.

6. Putnam shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

   a. Putnam shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the Putnam Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of Putnam's operating businesses. Putnam shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. Putnam shall report on issues arising under the Code of Ethics, including all violations thereof, to the Audit Committee of the Trustees of the Putnam funds with such frequency as the Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly.

   b. Putnam shall establish an Internal Compliance Controls Committee to be chaired by Putnam's Chief Compliance Officer, which Committee shall have as its members senior executives of Putnam's operating businesses. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent staff of the

Putnam Investment Management, LLC Admin. Proc. Rel. No. IA-2192 / November 13... Page 13 of 17

Case 1:05-cv-10923-NG    Document 10-2    Filed 06/20/2005    Page 16 of 25

Trustees of the Putnam funds, who shall be invited to attend and participate in such meetings. The Internal Compliance Controls Committee shall review compliance issues throughout the business of Putnam, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Audit Committee of the Trustees of the Putnam funds with such frequency as the independent Trustees of such funds may instruct, and in anyevent at least quarterly. Putnam shall also provide to the Audit Committee of Marsh & McLennan Companies, Inc. the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Audit Committee of the Putnam funds.

7. Putnam shall establish a corporate ombudsman to whom Putnam employees may convey concerns about Putnam business matters that they believe implicate matters of ethics or questionable practices. Putnam shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent Trustees of the Putnam funds. Putnam shall also review matters brought to the attention of the ombudsman, along with any resolution of such matters, with the independent Trustees of the Putnam funds with such frequency as the independent Trustees of such funds may instruct.

E. Restitution. Putnam shall also comply with the following undertakings:

1. Putnam shall retain, within 30 days of the date of entry of the Order, the services of an Independent Assessment Consultant acceptable to the staff of the Commission and the independent Trustees of the Putnam funds. The Independent Assessment Consultant's compensation and expenses shall be borne exclusively by Putnam. The Independent Assessment Consultant shall calculate the monetary amounts necessary to fairly compensate Putnam funds' shareholders for losses attributable to excessive short-term trading and market timing trading activity by Putnam employees according to a methodology developed in consultation with Putnam and acceptable to the staff of the Commission and the independent Trustees of the Putnam funds. Putnam shall cooperate fully with the Independent Assessment Consultant and shall provide the Independent Assessment Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. At the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order, the Independent Assessment Consultant shall submit to Putnam and the staff of the Commission an Assessment Report stating

Putnam Investment Management LLC, Admin. Proc. Rel. No. IA-2192 / November 13, . . . Page 14 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 17 of 25

the determinations and calculations called for by subparagraph IV.E.1 of these undertakings.

3. The determinations and calculations of the Independent Assessment Consultant shall be binding unless, within 150 days after the date of entry of the Order, Putnam or the staff of the Commission advises, in writing, the Independent Assessment Consultant of any determination or calculation from the Assessment Report that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

4. With respect to any determination or calculation with which Putnam or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event that Putnam and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Assessment Consultant shall be binding.

5. Within 195 days of the date of entry of the Order, Putnam shall take all necessary and appropriate steps to compensate the funds' shareholders in accordance with the binding determinations and calculations reached in accordance with the procedure set forth above.

6. The Independent Assessment Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any firm with which the Independent Assessment Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent Trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

F. Independent Compliance Consultant. Putnam shall also comply with the following undertakings:

1. Putnam shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant acceptable to the staff of the Commission and the independent Trustees of the Putnam funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by Putnam or its affiliates. The Independent Compliance Consultant shall conduct a comprehensive review of Putnam's supervisory, compliance, and other policies and

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2192 / November 13 . . . Page 15 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 18 of 25

procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Putnam and its employees. This review shall include, but shall not be limited to, a review of Putnam's market timing controls across all areas of its business, a review of the Putnam funds' pricing practices that may make those funds vulnerable to market timing, and a review of the Putnam funds' utilization of short term trading fees and other controls for deterring excessive short term trading. Putnam shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. At the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order, the Independent Compliance Consultant shall submit a Report to Putnam, the Trustees of the Putnam funds, and the staff of the Commission. The Report shall address the issues described in subparagraph IV.F.1 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of Putnam and the Putnam funds, and a procedure for implementing the recommended changes in or improvements to Putnam's policies and procedures.

3. Putnam shall adopt all recommendations with respect to Putnam contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days after the date of entry of the Order, Putnam shall in writing advise the Independent Compliance Consultant, the Trustees of the Putnam funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that Putnam considers unnecessary or inappropriate, Putnam need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

4. As to any recommendation with respect to Putnam's policies and procedures on which Putnam and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event Putnam and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, Putnam will abide by the determinations of the Independent Compliance Consultant.

5. Putnam (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the independent Trustees and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2192, November 13 . . . Page 16 of 17

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 19 of 25

Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the Trustees or the Commission.

6. The Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent Trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

G. <u>Periodic Compliance Review</u>. Commencing in 2005, and at least once every other year thereafter, Putnam shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of Putnam. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning Putnam's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Putnam and its employees in connection with their duties and activities on behalf of and related to the Putnam funds. Each such report shall be promptly delivered to Putnam's Internal Compliance Controls Committee and to the Audit Committee of the board of Trustees of each Putnam fund.

H. <u>Certification</u>. No later than twenty-four months after the date of entry of the Order, the chief executive officer of Putnam shall certify to the Commission in writing that Putnam has fully adopted and complied in all material respects with the undertakings set forth in this section IV and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

I. <u>Recordkeeping</u>. Putnam shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of Putnam's compliance with the undertakings set forth in this section IV.

J. <u>Deadlines</u>. For good cause shown, the Commission's staff may extend

Putnam Investment Management, LLC: Admin. Proc. Rel. No. IA-2192 / November 13... Page 17 of 17

Case 1:05-cv-10923-NG    Document 16-2    Filed 06/20/2005    Page 20 of 25

any of the procedural dates set forth above.

K. <u>Other Obligations and Requirements</u>. Nothing in this Order shall relieve Putnam or any Putnam fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

## **Civil Money Penalties and Other Monetary Relief**

L. In addition to the payment of restitution called for by section IV.E herein, Putnam shall pay a civil money penalty and other monetary relief, if any, in an amount to be determined either through a settlement or, if no settlement is reached, in an amount to be determined after a hearing. At that hearing, the issues will be limited to determining the appropriateness and amount of any such civil money penalty and other monetary relief. For purposes of the hearing, Putnam will be precluded from arguing that it did not violate the federal securities laws in the manner described herein, and the findings contained herein shall be accepted as and deemed true by the hearing officer. Without contesting the facts contained herein, either party shall be allowed to present evidence relating to the factors set forth in Section 203(i) of the Advisers Act and to present additional evidence relevant to the determination of what amount of civil money penalty or other monetary relief is appropriate. Furthermore, at that hearing, Putnam may not challenge the validity of its Offer or this Order.

By the Commission.

Jonathan G. Katz
Secretary

---

1  The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2  A round trip trade is one in which the employee bought and then sold mutual fund shares. The actual number of round trip trades was much larger because Kamshad, Scott and other employees often traded in multiple personal accounts on the same days. For example, if Kamshad purchased mutual fund shares and then sold shares two days later, that transaction is alleged herein to be one round trip trade, even though he may have spread the purchase and sale over two or three different personal accounts on those days.

*http://www.sec.gov/litigation/admin/ia-2192.htm*

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2226, IC-26412 / April ... Page 1 of 5

Case 1:05-cv-10923-NG Document 16-2 Filed 06/20/2005 Page 21 of 25

Home | Previous Page

## U.S. Securities and Exchange Commission

**United States of America**
**Before the**
**Securities and Exchange Commission**

**Investment Advisers Act of 1940**
**Release No. 2226 / April 8, 2004**

**Investment Company Act of 1940**
**Release No. 26412 / April 8, 2004**

**Administrative Proceeding**
**File No. 3-11317**

| | |
|---|---|
| In the Matter of<br><br>PUTNAM INVESTMENT MANAGEMENT, LLC<br><br>Respondent. | ORDER MAKING FINDINGS AND IMPOSING SUPPLEMENTAL REMEDIAL SANCTIONS PURSUANT TO SECTION 203(e) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940 |

### I.

The Securities and Exchange Commission ("Commission") instituted administrative and cease-and-desist proceedings pursuant to Sections 203 (e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Putnam Investment Management, LLC ("Putnam" or "Respondent") on October 28, 2003. On November 13, 2003 the Commission entered an Order Making Findings and Imposing Partial Relief, Including a Final Censure, Remedial Undertakings and a Cease-and-Desist Order Pursuant To Sections 203(e) and 203(k) of the Advisers Act and Sections 9(b) and 9(f) of the Investment Company Act ("Partial Settlement Order"), which remains in full force and effect.

### II.

Respondent has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings and the findings contained in paragraphs 1 and 4 of Section III of the Partial Settlement

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2226, IC-26412, April ... Page 2 of 5

Case 1:05-cv-10923-NG   Document 10-2   Filed 06/20/2005   Page 22 of 23

Order, which are admitted, Respondent consents to the entry of this Order Making Findings and Imposing Supplemental Remedial Sanctions Pursuant ToSection 203(e) of the Advisers Act and Section 9(b) of the Investment Company Act ("Order"), as set forth below. This Order supplements, but does not supersede, the Partial Settlement Order; provided, however, that to the extent deadlines in this Order and the Partial Settlement Order may conflict, Putnam shall be required to comply with the deadlines imposed by this Order.

### III.

A. The findings set forth in Section III of the Partial Settlement Order are hereby incorporated by reference as though fully set forth herein.

B. In determining to accept the Offer, the Commission considered cooperation afforded the Commission staff by Putnam during its continuing investigation and Putnam's agreement to pay a separate $50 million penalty to resolve an enforcement proceeding brought by the Massachusetts Securities Division that alleged, in part, conduct identical to that found in the Partial Settlement Order.

### IV.

In view of the foregoing, the Commission deems it appropriate in the public interest and for the protection of investors to impose the sanctions agreed to in Putnam's Offer in addition to the sanctions set forth in the Partial Settlement Order. Accordingly, it is hereby ORDERED, effective immediately, that:

**A. Disgorgement and Civil Money Penalty**. Putnam shall, within 10 days of the entry of this Order, pay $5 million in disgorgement plus a civil money penalty of $50 million for a total payment of $55 million. Such payment shall be: (a) made by United States postal money order or wire transfer, certified check, bank cashier's check or bank money order; (b) made payable to the Securities and Exchange Commission; (c) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies Putnam as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to thegovernment for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Putnam agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Putnam ("Putnam Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Putnam

Putnam Investment Management, LLC, Admin. Proc. Rel. No. IA-2226, IC-26412, April ... Page 3 of 5

Case 1:05-cv-10923-NG    Document 10-2    Filed 06/20/2005    Page 23 of 25

agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Putnam Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Putnam in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Putnam by or on behalf of one or more investors based on substantially the same facts as those set forth in the Partial Settlement Order.

## Undertakings

## B. Distribution of Disgorgement and Penalty

1. Putnam shall retain, within 10 days of the date of entry of the Order, the services of an Independent Distribution Consultant acceptable to the staff of the Commission and the independent Trustees of the Putnam funds. The Independent Distribution Consultant may be, but is not required to be, the same person as the Independent Assessment Consultant contemplated by Section IV.E of the Partial Settlement Order. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by Putnam. Putnam shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

a. Putnam shall require that the Independent Distribution Consultant develop a Distribution Plan for the distribution of all of the $55 million in disgorgement and penalty, and any interest or earnings thereon, according to a methodology developed in consultation with Putnam and acceptable to the staff of the Commission and the independent Trustees of the Putnam funds. The Distribution Plan shall provide for investors to receive, inorder of priority, (i) their aliquot share of losses as calculated by the Independent Assessment Consultant pursuant to Section IV.E of the Partial Settlement Order, and (ii) a proportionate share of advisory fees paid by funds that suffered such losses during the period of such market timing.

b. The restitution amount that Putnam is required to pay pursuant to Section IV.E.5 of the Partial Settlement Order shall be paid out of the payments required by Section IV.A herein. In the event that the Independent Assessment Consultant determines that full restitution under Section IV.E. of the Partial Settlement Order would require a payment of more than $10 million, Putnam agrees that it shall make an additional payment of the amount above $10 million. Payment of such amount shall be made in the manner provided in Section IV.A herein for inclusion in the Fair Fund within 15 days of the final determination of the Independent Assessment Consultant that full restitution would require a payment of more than $10 million.

Putnam Investments Management, LLC; Admin. Proc. Rel. No. IA-2226; IC-26412; April ... Page 4 of 5

Case 1:05-cv-10923-NG Document 16-2 Filed 06/20/2005 Page 24 of 25

2. Putnam shall require that the Independent Distribution Consultant submit a Distribution Plan to Putnam and the staff of the Commission no more than 100 days after the date of entry of the Order.

3. The Distribution Plan developed by the Independent Distribution Consultant shall be binding unless, within 130 days after the date of entry of the Order, Putnam or the staff of the Commission advises, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

4. With respect to any determination or calculation with which Putnam or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 160 days of the date of entry of the Order. In the event that Putnam and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Distribution Consultant shall be binding.

5. Within 175 days of the date of entry of this Order, Putnam shall require that the Independent Distribution Consultant submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following a Commission order approving a final plan of disgorgement, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, Putnam shall require that the Independent Distribution Consultant, with Putnam, take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

6. Putnam shall require that the Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Putnam shall require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order not, without prior written consent of the independent Trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Putnam, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

**C. Deadlines**. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

By the Commission.

Jonathan G. Katz

Putnam Investment Management, LLC - Admin. Proc. Rel. No. IA-2226; IC-26412 / April    Page 5 of 5

Case 1:05-cv-10923-NG    Document 10-2    Filed 06/20/2005    Page 25 of 25

Secretary

*http://www.sec.gov/litigation/admin/ia-2226.htm*

Home | Previous Page                                    Modified: 04/08/2004